**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                           **Criminal Case No.: 1:22-CR-11-7
(JUDGE KLEEH)**

**DERRICK HAMLET,**

       **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 221] BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant Derrick Hamlet's Motion to Suppress Physical Evidence, [ECF No. 221], filed on September 16, 2022. By Order entered the same day, September 16, 2022, [ECF No. 222], United States District Judge Thomas S. Kleeh referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's Response to the Defendant's Motion to Suppress Evidence, filed on September 23, 2022. [ECF No. 227]. The undersigned conducted a hearing on Defendant's motion on November 8, 2022, at which the Court heard witness testimony and accepted exhibits into evidence.

Based on a detailed review of Defendant's motion, [ECF No. 221], the Government's response, [ECF No. 227], the exhibits introduced into evidence at the hearing on Defendant's motion, and the testimony given by witnesses at said hearing, the undersigned **RECOMMENDS** that Defendant's motion, [ECF No. 221], be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Derrick Hamlet ("Defendant") stands accused in five counts of a Superseding Indictment which a Grand Jury returned against him and others on May 3, 2022. [ECF No. 163]. Defendant is named in the Superseding Indictment in Count One with the offense of Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846, in Count Two with the offense of Possession with Intent to Distribute Fentanyl and Heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), in Count Three with the offense of Possession of a Firearm in Furtherance of a Drug Offense, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i) and Title 21, United States Code, Section 841(a)(1), in Count Six with the offense of Aiding and Abetting Distribution of Fentanyl in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and lastly, in Count Nine with Aiding and Abetting Distribution of Heroin, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

The factual scenario underlying Counts Two and Three of the Superseding Indictment, Possession with Intent to Distribute Fentanyl and Heroin and Possession of a Firearm in Furtherance of a Drug Offense, and the subject Motion to Suppress arise from a traffic stop that occurred on February 15, 2020.

On the evening of February 15, 2020, West Virginia State Trooper V. L. "Vicky" Marra was stationed in her marked police cruiser near Mile Marker 140 on Interstate 79 in Marion County, West Virginia. Just before 8:00 PM, Trooper Marra observed a golden-color Saturn vehicle driving with a nonfunctional front headlight. Trooper Marra watched the Saturn pass, activated her cruiser's lights and sirens, then pursued the vehicle to initiate a traffic stop. The

Saturn vehicle showed no indication of stopping, despite Trooper Marra's pursuit with lights and sirens and proceeded to drive another five (5) miles into Monongalia County, West Virginia. Trooper Marra observed copious movement in the vehicle, particularly between the driver and front seat passenger, which made her suspicious about possible concealment of contraband occurring within the vehicle

After the Saturn vehicle and marked police cruiser pulled off the interstate near Mile Marker 146, Trooper Marra ran the license plate of the vehicle and recognized the name of the individual who owned the Saturn, Dennis Lytle. Marra knew Lytle to be an individual with a narcotics-related criminal history whom Marra had interacted with in her prior position as a Monongalia County Probation Officer.

Trooper Marra turned on her cruiser's spotlight and approached the Saturn from the passenger side. She observed three people in the vehicle – a driver, a front seat passenger, and a backseat passenger behind the driver. Trooper Marra asked the occupants to roll their windows down, and the driver rolled all the windows down. Trooper Marra observed a slight odor of marijuana. Trooper Marra advised the occupants to not move and to keep their hands where she could see them.

Trooper Marra used her flashlight to look inside the vehicle upon approach; she soon observed what appeared to be the barrel of a firearm in the sweatshirt or "hoodie" pocket of the front seat passenger. Trooper Marra used her portable radio to request backup and wielded her firearm. Trooper Marra asked the front seat passenger, later identified as Derrick Hamlet, if what she was observing was a firearm. The front seat passenger did not respond. Trooper Marra asked again, and, eventually, Hamlet nodded his head "yes." Trooper Marra informed Hamlet she was going to remove the firearm from his hoodie, and again commanded Hamlet not to move. Trooper

Marra removed the firearm and secured it in her vehicle before returning to the Saturn. Trooper Marra explained to the occupants the reason for the traffic stop and requested identification from each occupant.

Then, at approximately 8:10 PM, Senior Trooper Freddie Little of the Marion County detachment of the West Virginia State Police arrived on scene as backup. Troopers Marra and Little removed the occupants from the vehicle and detained them. As Derrick Hamlet was stepping out of the front passenger seat of the Saturn, the troopers observed a pink Igloo cooler on the floor of the vehicle for the first time, just below where Derrick Hamlet had been seated.

Trooper Little spoke to the front seat passenger, Derrick Hamlet, and the back seat passenger, Darryl LaMaster, while Trooper Marra ran the identification provided by each occupant through the West Virginia State Police dispatch. Trooper Marra learned from dispatch that the Saturn driver, Dennis Lytle, had three outstanding arrest warrants – two warrants from Monongalia County, West Virginia, and one extraditable arrest warrant from Ohio. The backseat passenger, Darryl LaMaster, had an outstanding, "in-state pickup only" arrest warrant from Michigan. Based on those out-of-state warrants, a hit request would need to be run by dispatch to determine the validity of the warrants and to determine whether Michigan would want LaMaster arrested on his outstanding warrant which was labelled "for in-state pickup only." Trooper Marra was also informed by dispatch that the front seat passenger, Derrick Hamlet, had no outstanding warrants, but based on his Triple III Report, he had a criminal history and was prohibited, or "disqualified," from possessing firearms.

Trooper Marra then continued her roadside investigation by speaking with the driver, Dennis Lytle, whom she was familiar with from her prior work as a probation officer. Lytle told Trooper Marra that he was doing work with Officer Forbes of the Mon. Metro Drug Task Force.

Based on his behavior and body language, Trooper believed Lytle didn't want the other occupants, who were in the vicinity, to know this information. When Trooper Marra asked Lytle if there was anything in the vehicle she should know about, Lytle verbally answered "I don't think so" but shook his head "yes" to indicate there actually was something in the vehicle. Lytle advised Marra that the group was on their way home from a Narcotics Anonymous ("NA") meeting, and he was unaware of his outstanding warrants. Trooper Marra did not believe Lytle's statement that the vehicle occupants were coming from an NA meeting.

Trooper Marra asked Lytle if she could have consent to search his vehicle, and Lytle said Marra could search the vehicle and his stuff, but not his friends' items. Next, Trooper Marra told the other occupants, who had been conversing with Trooper Little, that Lytle had consented to a search of the vehicle, and Trooper Marra asked if they would give consent for their items to also be searched. Hamlet stated he didn't see a reason for the troopers to search his things.

 Trooper Marra told the occupants she would be requesting a K-9 unit to do an open-air sniff. Derrick Hamlet told the troopers the "dog will hit" because he smoked marijuana earlier that day. Trooper Marra believed that if Derrick Hamlet was a habitual marijuana user and had used marijuana on this day, this would be another basis for why he could not lawfully be in possession of the firearm under West Virginia law. At this time, Trooper Marra believed she would be arresting all the vehicle's occupants at the conclusion of the traffic stop – Dennis Lytle would be arrested for the outstanding Monongalia County and Ohio arrest warrants, Darryl LaMaster would be arrested for the outstanding Michigan arrest warrant, and Derrick Hamlet would be arrested, based on his Triple III report and the observed possession of a firearm, for unlawful possession of a firearm.

Then, at approximately 9:13 PM, Trooper Marra requested the K-9 unit.[1] Dispatch advised that Deputy Sergeant Timothy Hunn of the Monongalia County Sheriff's Department would be the responding K-9 unit; however, his estimated drive time to arrive on scene was thirty to thirty-five minutes.

Once the K-9 unit arrived on scene, at approximately 9:42 PM, Sgt. Hunn ran the K-9 around the perimeter of the Saturn vehicle, and the K-9 gave a positive alert to the presence of narcotics. Troopers Marra and Little searched the vehicle. Inside the pink Igloo cooler, found on the floor of the vehicle in front of where Derrick Hamlet had been seated, troopers found digital scales as well as prepackaged baggies of marijuana and prepackaged baggies of a white powdery substance. A field test revealed that the white substance found in the bags was heroin and fentanyl. All three vehicle occupants were arrested by the troopers and transported back to the station for processing.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on November 8, 2022, the Court heard sworn testimony from one witness, namely: West Virginia State Trooper V. L. "Vicky" Marra.

The Court also received the following exhibits into evidence: (1) Defendant's Exhibit No. 1, West Virginia State Police Report of Criminal Investigation, ECF No. 253-1; (2) Defendant's Exhibit No. 2, Triple III Police Report, ECF No. 253-2; and (3) Defendant's Exhibit No. 3, MECCA 9-1-1 CAD Report, ECF No. 253-3.

### Testimony of West Virginia State Trooper V. L. "Vicky" Marra

---

[1] *See* ECF No. 253-3, Defendant's Exhibit No. 3, MECCA 9-1-1 CAD Report.

According to the testimony[2] of West Virginia State Trooper V. L. "Vicky" Marra ("Trooper Marra"), Trooper Marra has served with the West Virginia State Police for approximately four years and presently serves as a Field Trooper. [10:05:32-10:05:56]. Prior to her position as a state trooper, Trooper Marra was a Monongalia County, West Virginia Probation Officer for five years. [10:06:30-10:06:41].

Trooper Marra has received training through the West Virginia State Police on drug interdiction, including what body language and speech patterns to look for from individuals who may be involved in drug use, drug distribution or drug possession. [10:05:57-10:06:29; 10:29:22-10:30:00]. Examples of behavior Trooper Marra is trained to look for in drug interdiction include concealment, limited or evasive contact, dishonesty, uncomfortable body language, and use of specific lingo. [10:30:01-10:31:19; 10:37:40-10:38:19].

On February 15, 2020, Trooper Marra was working the evening shift, which is generally 4:00 PM to 12:00 AM. [10:06:42-10:07:03]. Trooper Marra did not have a camera in her police vehicle, nor did she have a body camera at the time. Trooper Marra was running her traffic and actions through the West Virginia State Police Communications Center dispatch rather than through the MECCA 9-1-1 CAD dispatch system. [10:07:04-10:07:30; 10:31:32-10:32:29]. Trooper Marra also memorialized the traffic stop at issue in a subsequent report.[3] [10:32:30-10:32:44; 10:35:00-10:35:06; 10:36:37-10:36:47; 11:15:39-11:16:58].

---

[2] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on November 8, 2022, which is located on the section of the Court's intranet site for FTR recordings.
[3] *See* Defendant's Exhibit No. 1, West Virginia State Police Report of Criminal Investigation, ECF No. 253-1.

On this evening, Trooper Marra was stationed in the median on Interstate 79 ("I-79") around Mile Marker 140, in Marion County, West Virginia, conducting speed control and road control, in her marked state police vehicle equipped with sirens and lights. [10:07:31-10:08:13].

Just before 8:00 PM, Trooper Marra observed a golden-color Saturn vehicle coming north on I-79 with a front headlight out, a traffic violation. [10:08:14-10:08:41; 10:32:45-10:33:04; 10:40:41-10:40:50]. Trooper Marra was running laser radar from her stationary position and noted that the vehicle was going eighty miles per hour. [10:33:18-10:33:58].

After she observed the traffic violation, at 8:00 PM, Trooper Marra watched the Saturn pass, activated her vehicle's lights and sirens, then exited from the median out onto the interstate when there was a safe opening in interstate traffic. [10:08:42-10:09:00; 10:33:05-10:33:17; 10:40:51-10:41:06; 10:59:24-10:59:29]. Trooper Marra, on cross examination, stated she did not believe the vehicle sped up after she began pursuit but could not state with certainty because she cannot use the radar gun simultaneously while driving. [10:33:18-10:34:35]. Trooper Marra testified that it took approximately twenty-five (25) seconds to get out onto the interstate, catch up, and pull behind the Saturn. [10:09:01-10:09:42; 10:59:15-10:59:23].

Once behind the Saturn, Trooper Marra observed a lot of movement in the vehicle, including head movement by the driver and front passenger. [10:09:43-10:09:54; 10:10:42-10:11:03; 10:34:47-10:34:59]. Trooper Marra considered this to be the "felony shuffle," a term used in drug interdiction to describe the behavior pattern where a lot of movement happens in a vehicle prior to a traffic stop because the occupants are hiding items. [10:15:31-10:16:12]. Trooper Marra testified, on cross examination, that oftentimes when drivers are being pulled over, they keep their eyes forward, keep driving, and pull over, rather than physically turning around or moving their heads to look at the cruiser behind them. [10:36:48-10:37:39].

The Saturn vehicle continued to travel north on I-79 without indication of stopping, despite Trooper Marra's use of her sirens and lights in the dark evening conditions. [10:09:55-10:10:15]. The Saturn vehicle continued driving for approximately five (5) miles, traveling from Marion County, West Virginia into Monongalia County, West Virginia; the Saturn vehicle pulled over around Mile Marker 146. [10:10:16-10:10:41; 10:11:04-10:11:22; 10:34:36-10:34:46; 11:20:06-11:21:05]. Trooper Marra noted in her report that "As the suspect vehicle pulled off to the right side of the roadway the undersigned officer observed the three (3) subjects fidgeting around inside the vehicle in a frantic matter which appeared to be suspicious." [10:35:06-10:36:37]. Trooper Marra testified that at this point in her career, she had been involved in over one hundred (100) traffic stops and had not yet had the situation such as this where the driver refused to pull over. [10:11:23-10:11:44].

Once the Saturn vehicle pulled over, Trooper Marra pointed her cruiser vehicle spotlight on the Saturn, which is something she was taught to do during her academy training, as a safety measure. Trooper Marra ran the license plate of the Saturn, then exited her vehicle. [10:11:45-10:12:13]. By running the license plate, Trooper Marra discovered the vehicle was registered to Dennis Lytle. She recognized this name because he was an individual who had a narcotics-related criminal history in Monongalia County, West Virginia. [10:38:19-10:38:43; 10:38:48-10:39:27]. Based upon this, she had a suspicion there may be narcotics or drug activity in the vehicle she was pulling over. [10:38:44-10:38:47].

Trooper Marra approached the Saturn from the passenger side. [10:12:14-10:12:23; 10:39:33-10:39:55]. She observed three people in the vehicle – a driver, a front seat passenger, and a backseat passenger behind the driver. [10:12:32-10:12:52]. Trooper Marra also observed a cell phone flashlight coming from the driver of the vehicle. [10:41:17-10:41:47].

Trooper Marra was holding her flashlight and swept her light from the rear of the vehicle towards the front. Trooper Marra asked the occupants to roll their windows down, and the driver rolled all the windows down. [10:41:58-10:42:12; 10:42:15-10:42:20]. Trooper Marra testified that she detected a slight odor of marijuana as she approached, but she did not indicate that in her later written report. [10:59:57-11:00:08; 11:27:24-11:27:30].

Trooper Marra told the occupants to keep their hands where she could see them and not move. [10:15:17-10:15:25; 10:42:13-10:42:15]. Trooper Marra testified that the Saturn driver closed his hands on the steering wheel, the backseat passenger put his hands on the back headrest of the driver's seat, and the front seat passenger, later identified as Derrick Hamlet, was still, but did not comply. Trooper Marra testified she could not see his hands. [10:14:07-10:14:33; 10:42:40-10:43:12].

Trooper Marra's flashlight glimmered off metal, which she could plainly see through the window, and Trooper Marra observed what appeared to be the barrel of a firearm in the hoodie pocket of the front seat passenger. [10:12:53-10:13:49; 10:41:48-10:41:57; 10:43:48-10:44:04]. Once she observed the firearm, Trooper Marra requested backup assistance over her portable radio and wielded her firearm to hold the vehicle at gunpoint. [10:15:02-10:15:16; 10:16:13-10:16:24; 10:39:28-10:39:32; 10:45:11-10:45:33]. Trooper Marra testified the reason she requested backup was for officer safety reasons because it was dark outside, she was on the interstate, there had been a weapon involved in the traffic stop, and there were three vehicle occupants and only herself on scene as law enforcement. [10:17:11-10:17:28; 10:31:20-10:31:31].

Trooper Marra asked if what she was observing was a firearm, and the front seat passenger, Defendant Derrick Hamlet, did not respond. [10:14:34-10:14:40]. Trooper Marra testified that she again asked Derrick Hamlet if the item observed was a firearm, and, eventually, Defendant Hamlet

nodded his head "yes," indicating to Trooper Marra that it was a firearm in his pocket. [10:13:50-10:14:06; 10:14:41-10:14:53; 10:43:13-10:43:47; 10:57:09-10:57:25]. Trooper Marra informed Hamlet she was going to remove the firearm from his sweatshirt, again commanded Hamlet not to move, and, then, she removed the firearm. [10:14:54-10:15:02; 10:15:16-10:15:30; 10:44:05-10:44:15]. After retrieving the firearm, Trooper Marra secured the firearm in her own vehicle, by taking backwards steps while maintaining eye contact on the Saturn occupants, opening her vehicle door, placing the firearm inside, then returned to the proximity of the Saturn to talk with the vehicle occupants. [10:16:25-10:16:41; 10:44:28-10:46:04]. Trooper Marra explained to the occupants the reason for the traffic stop and requested identification from each occupant. [10:44:16-10:44:27; 10:46:04-10:46:25; 10:47:06-10:48:10].

Trooper Marra testified, on cross-examination, that she believed she had reasonable suspicion of criminal activity at this time based upon the five-mile delay in pulling over, the behavior of the three individuals as they pulled over, including the fidgeting and shuffling, and the presence of a firearm. [10:54:49-10:55:15; 11:21:07-11:21:52].

Senior Trooper Freddie Little of the Marion County detachment of the West Virginia State Police arrived on scene a few minutes later, at approximately 8:10 PM. [10:16:42-10:17:10; 10:40:13-10:40:40; 10:41:07-10:41:14]. Once Trooper Little arrived, he approached the passenger-side of the Saturn while Trooper Marra approached the driver-side of the Saturn to remove the occupants, one by one, from the vehicle. [10:17:29-10:17:39; 10:39:36-10:40:12; 10:48:28-10:48:45]. When Derrick Hamlet exited the vehicle, Trooper Marra observed for the first time a pink lunchbox, which had previously been concealed by Hamlet's body, on the front passenger floor. [10:27:17-10:27:33].

Once Trooper Little arrived, he conversed with the vehicle occupants while Trooper Marra ran the names and identification received from each vehicle occupant through dispatch; troopers identified Dennis Lytle as the driver, Derrick Hamlet as the front seat passenger, and Darryl LaMaster as the backseat passenger. [10:17:40-10:17:51; 10:42:21-10:42:39; 10:48:10-10:48:27]. With the assistance of dispatch, Trooper Marra ran NCIC checks on each vehicle occupant and learned that the driver of the Saturn, Dennis Lytle, had three outstanding warrants – two from Monongalia County, West Virginia, and one fully-extraditable warrant from Ohio. [10:17:52-10:18:29; 10:48:46-10:49:02; 10:49:42-10:49:56]. Trooper Marra learned that the backseat passenger, Darryl LaMaster, had a warrant out of the state of Michigan. [10:18:30-10:18:43]. The warrant, according to the initial NCIC check, was "for in-state pickup only." However, from experience, Trooper Marra knows that, upon a further inquiry (a required hit request), Michigan frequently asks that individuals be arrested pending extradition on such warrants regardless of the "in-state pickup only" label. [10:49:57-10:50:27; 11:23:29-11:23:39].

Trooper Marra was also informed by dispatch that Derrick Hamlet had a criminal history and was a prohibited person but had no outstanding warrants. Trooper Marra specifically asked dispatch if they could run a Triple III report on Derrick Hamlet and if there was anything on his Triple III report which would cause him to be a prohibited person. Trooper Marra was attempting to determine if Derrick Hamlet was able to legally carry the gun she had retrieved. Dispatch relayed that he was a prohibited person, based on the Triple III report, which stated "**Caution Information – Firearms Disqualified Status**,"[4] indicating that Hamlet was prohibited from possessing a firearm. [10:18:43-10:19:09; 10:50:35-10:53:06]. The Triple III report listed that Hamlet's criminal history went back to his juvenile years, starting in 2009, and included charges for stolen

---

[4] *See* Defendant's Exhibit No. 2, Triple III Report, ECF No. 253-2 at 6-7.

property, a weapons' offense, possession of dangerous drugs, and a firearm felony. [11:09:16-11:11:13; 11:18:32-11:18:43; 11:26:06-11:26:42]. Trooper Marra testified that after the Triple III report came back indicating he was a prohibited person, she determined she would also be placing Hamlet under arrest. [10:53:07-10:53:28; 11:18:44-11:19:05; 11:23:40-11:23:46].

Trooper Marra conducted further roadside investigation by speaking with the driver, Dennis Lytle. [10:19:10-10:19:23]. Trooper Marra was familiar with the driver, Dennis Lytle, because if their prior interactions when Lytle was on state probation and Marra worked as a Mon. County Probation Officer. [10:19:23-10:19:38]. Trooper Marra testified that Lytle offered to her, in roadside conversation, that he was doing work with the drug task force but didn't want to announce it. [10:19:39-10:19:53].

When Trooper Marra asked Lytle if there was anything in the vehicle she should know about, Lytle verbally answered "I don't think so" but shook his head "yes" to indicate there actually was something in the vehicle. [10:19:54-10:20:15; 10:46:26-10:46:35; 10:58:07-10:58:11]. On cross examination, Trooper Marra testified she did not document this nod or shaking of the head or the information that Dennis Lytle was working with the local drug task force in her later report. [10:46:36-10:47:06]. Trooper Marra testified his body language suggested to her that Lytle didn't want the others to know this information and the other vehicle occupants were in the vicinity nearby. [10:20:44-10:21:43]. Lytle further advised Marra that the group was on their way from a Narcotics Anonymous ("NA") meeting, and he was unaware of his outstanding warrants. [10:20:16-10:20:43 10:57:53-10:58:07; 11:19:37-11:19:57]. Trooper Marra did not believe that the vehicle occupants were, in truth, coming from an NA meeting. [11:19:58-11:20:05].

Trooper Marra took Lytle to her cruiser vehicle so they could speak more freely. [10:21:44-10:21:51]. When Trooper Marra again asked if there was anything in the vehicle, Lytle bypassed

the question and advised he was working as a confidential informant with Officer Forbes of the Mon. Metro Drug Task Force. [10:21:52-10:22:16]. Lytle again stated he was coming from an NA Meeting, and he was on probation. Marra asked if she could have consent to search his vehicle. [10:22:16-10:22:36].  Lytle told Marra she could search the vehicle and his stuff, but not his friends' items. [10:22:37-10:22:44; 11:00:32-11:00:49]. Marra had no reason to believe, based on their interactions, that Lytle was under the influence during the traffic stop. [11:00:22-11:00:31].

Marra exited her vehicle and saw Trooper Little was also outside his vehicle conversing with Hamlet and LaMaster, while the two troopers were waiting for "hit request" confirmations. [10:22:45-10:22:57].

On cross examination, Trooper Marra testified that the initial NCIC checks on individuals generally come back within a couple minutes and inform troopers whether there are any outstanding warrants for the subject individual, whereas "hit requests" take much longer. Hit requests involve notifying the state where the arrest warrant originates, informing that state that the West Virginia State Police have an individual with an outstanding arrest warrant detained, and asking whether that state wants the individual placed into custody for pickup on said arrest warrant. [10:49:03-10:49:41; 11:12:55-11:13:21; 11:17:53-11:18:16; 11:21:53-11:22:04]. West Virginia State Police Communication Center dispatch is required to run these hit requests when there are out of state warrants. [10:49:57-10:50:27].

Trooper Marra told the other occupants that Lytle had consented to the search of the vehicle, and Trooper Marra asked if they would give consent for their items to also be searched. [10:22:58-10:23:10]. LaMaster advised Marra the only items he had were his cell phone and charger. [10:23:11-10:23:16]. Hamlet stated he didn't see a reason for the troopers to search his things. [10:23:17-10:23:22].

14

At that time, Trooper Marra requested a K-9 unit. [10:23:23-10:23:28; 10:23:52-10:23:58]. On cross-examination, Trooper Marra explained that she requested the K-9 unit because, in addition to the vehicle's five-mile delay in pulling over, the suspicious, fidgeting behavior by the vehicle occupants, the cell phone light and the movement which may reflect concealment of contraband by the occupants, and the firearm retrieved from Hamlet's hoodie, her interactions with Lytle, in addition to her knowledge and experience from prior dealings with Lytle, made her believe there would be controlled substances or drug evidence inside the vehicle. [10:57:26-10:57:53; 10:58:12-10:59:14; 11:00:09-11:00:21].

Trooper Marra further testified that, at the time of the K-9-unit request, while she was aware of the outstanding warrants for Lytle and LaMaster, she was still waiting on the full results of the hit requests from the other states – Michigan and Ohio. [11:22:05-11:23:28]. Trooper Marra testified that when the hit request came back for LaMaster, Michigan, indeed, stated they wanted West Virginia State Police to arrest LaMaster on their out-of-state Michigan arrest warrant. [10:50:28-10:50:34].

Trooper Marra also told the occupants she would be requesting a K-9 to do an open-air sniff. [10:23:29-10:23:33]. Derrick Hamlet told Trooper Marra that the "dog will hit" because he smoked marijuana that day. [10:23:34-10:23:39]. Trooper Marra testified it was her understanding, upon hearing this, that if Derrick Hamlet is a drug user, he cannot be in possession of the firearm under West Virginia law, and this also served as a basis for charging him as a prohibited person in possession of a firearm. [10:23:40-10:23:51; 10:55:15-10:57:00; 11:18:20-11:18:31; 11:19:06-11:19:37; 11:24:00-11:26:06; 11:26:42-11:27:22].

Trooper Marra was advised by dispatch that Deputy Sergeant Hunn of the Mon. County Sheriff's Department would respond to her location as the K-9 unit, but because he was on the

western side of the county, his drive time to arrive on scene was approximately thirty to thirty-five minutes. [10:23:52-10:24:24; 11:02:53-11:03:21].

At this time, Trooper Marra intended to arrest and take into custody all three vehicle occupants because Lytle had outstanding warrants, both two confirmed warrants from Mon. County, West Virginia, and one unconfirmed warrant from Ohio, LaMaster had a warrant out of Michigan, and Hamlet, according to his Triple III report, was a prohibited person in possession of a firearm. [10:24:25-10:25:09; 11:02:31-11:02:52].

Trooper Marra testified that upon arrest of the three individuals, the vehicle would be towed. [10:25:10-10:25:23]. Trooper Marra testified there is no specific West Virginia State Police written policy about when or when not to tow a vehicle following a traffic stop. [11:17:10-11:17:18; 11:17:30-11:17:45]. However, there is a West Virginia State Police policy that states that if a vehicle is going to be towed, prior to that vehicle being towed, Trooper Marra would need to take inventory of everything located inside the vehicle. [10:25:24-10:25:44; 11:17:19-11:17:29]. On cross examination, Trooper Marra testified that there is some discretion given to West Virginia State Police troopers to decide whether licensed passengers or other licensed drivers, with consent of the arrestee, may drive away a vehicle home upon arrest of the driver-arrestee, rather than having it automatically towed. [11:00:50-11:01:45]. Trooper Marra further testified that, while Derrick Hamlet had a valid driver's license, she, in her discretion, would not have let him drive this vehicle away from the scene at night with defective equipment. [11:01:46-11:02:30; 11:13:22-11:14:19].

Once Sgt. Hunn arrived with his K-9, he ran his dog around the perimeter of the vehicle, and the dog alerted to the presence of a narcotic substance. [10:25:45-10:26:23]. After the K-9's alert, Troopers Marra and Little searched the Saturn vehicle. [10:26:24-10:26:36]. Located on the floor of the front passenger side of the vehicle, where Derrick Hamlet had previously been sitting,

16

troopers located a pink lunchbox. [10:26:27-10:26:55; 10:27:09-10:27:16]. Within the lunchbox, troopers found digital scales as well as prepackaged baggies of marijuana and prepackaged baggies of a white powdery substance. [10:26:56-10:27:08]. A field test revealed that the white substance was heroin and fentanyl. [10:27:46-10:27:59].

Trooper Marra testified all three vehicle occupants were arrested and transported back to the station for processing. [10:28:01-10:28:10; 10:53:29-10:53:39]. Trooper Marra testified that while in the processing room at the station, Hamlet asked what he was being charged with and Trooper Marra responding by telling Hamlet that he was being charged with Possession with Intent to Deliver Heroin, Possession with Intent to Distribute Fentanyl, and Prohibited Person in Possession of a Firearm. [10:28:11-10:28:38]. Hamlet asked why and how he was being charged with Possession with Intent to Distribute, to which Trooper Marra responded that he was being charged that way because of the weight of the drugs seized. [10:28:39-10:28:48]. Hamlet asked how much the drugs weighed, and Trooper Marra advised Hamlet the weight of the drugs seized. [10:28:49-10:28:59]. Hamlet responded that "you have to take the paper out of the bag [before weighing it], the paper makes it heavier." [10:29:00-10:29:08]. Hamlet told Marra the bags should weight 0.5 grams without the packaging materials. [10:29:09-10:29:21].

Trooper Marra eventually obtained a state criminal complaint, and corresponding arrest warrant, charging Defendant Hamlet with the abovementioned charges. [10:53:40-10:54:39; 11:11:50-11:12:18]. In her criminal complaint, Trooper Marra relied on her Triple III report, rather than habitual drug use, as the basis for charging Defendant Hamlet with state criminal charges for unlawful possession of a firearm. [11:12:19-11:12:54]. A copy of the state criminal complaint was not provided to this Court. [11:11:14-11:11:45].

### III. LEGAL ISSUES AND ANALYSIS

Defendant contends that there was no reasonable suspicion of criminal activity sufficient to justify an investigative detention and search of Defendant Hamlet's belongings, and the detention of one hour and forty-two minutes waiting on a K-9 sniff was an unreasonable delay under the Fourth Amendment. First, Defendant argues that observation of a firearm on Defendant's person is insufficient to establish reasonable suspicion that criminal activity is afoot. Defendant notes that openly carrying a weapon is not a crime in the state of West Virginia, and further, asserts that Defendant Hamlet was not a felon or person otherwise prohibited from possessing a firearm on February 15, 2020. Defendant argues, moreover, that Trooper Marra's observation of moving persons, shifting within the vehicle, and a cell phone light do not support reasonable suspicion.

Secondly, Defendant argues that the length of Defendant's detention while awaiting a dog sniff precludes the conclusion that the seizure was reasonable in absence of probable cause. Defendant concludes, in argument, that because the items ultimately located in the igloo cooler were the product of a search conducted after an unreasonable delay and a search that was not supported by reasonable suppression, this evidence should be suppressed under the Fourth Amendment's exclusionary rule.

During oral arguments at the November 8, 2022 hearing, counsel for the Defendant conceded that Trooper Marra had the right to pull over the vehicle for the defective equipment – that is, the broken front headlight. [11:37:10-11:37:35]. However, counsel for the Defendant maintained that it was not a violation under federal or state law for Defendant to be possessing the firearm on that day, February 15, 2020, and that the lawful presence of a firearm carried by individual who is not a prohibited person should not be used as a basis for reasonable suspicion

pursuant to recent Supreme Court precedent, namely, <u>New York State Rifle & Pistol Assoc., Inc.</u> <u>v. Bruen</u>, ___ U.S. ___, 142 S.Ct. 2111, ___ L.Ed.2d ___ (June 23, 2022). [11:37:36-11:38:12].

Counsel for the Defendant further argued that Trooper Marra's reliance on the Triple III was misplaced, and not only should Defendant Hamlet not have been arrested and charged as a prohibited person in possession of a firearm, he should have been released from the scene, possibly with authority to drive the Saturn home for Mr. Lytle, rather than detained for an extended period of time. [11:38:13-11:39:16].

Counsel for the Defendant further argued at the hearing that the extended period of detention during this traffic stop violates the Supreme Court's Fourth Amendment precedent. Counsel for the Defendant further argued that inevitable discovery should not apply in this case because individual troopers have discretion over when to tow a vehicle upon the arrest of the driver, and the West Virginia  State Police do not have a written policy in place to dictate when they should tow a vehicle. [11:39:17-11:40:10]. Counsel for the Defendant cited <u>United States v.</u> <u>Williams</u>, No. 5:22-CR-18, 2022 WL 5241754 (N.D.W. Va. Oct. 6, 2022), as support for the notion that inevitable discovery should not apply in this case, where there is not a specific policy in place. Counsel for the Defendant proffered her belief that the dog alert was the true reason the vehicle was towed and argued that the vehicle tow was not inevitable. [11:40:11-11:42:54].

The Government, in response, argues that officers had reasonable suspicion of criminal activity even before the traffic stop was effectuated because the vehicle Defendant Hamlet was in traveled for almost six miles on I-79 after Trooper Marra activated her lights and sirens. The Government further notes that during those six miles, Trooper Marra observed the occupants shuffling therein, consistent with the act of hiding items within the car. The Government adds that after the traffic stop began Lytle advised Trooper Marra that the group just left an NA meeting,

that he was working with the drug task force, and that there may marijuana in the vehicle. The Government further notes that Defendant Hamlet stated a K-9 would alert on the vehicle because he had smoked marijuana. The Government argues these facts, along with officers' interactions with Defendant and the other occupants, provides reasonable suspicion that criminal activity was afoot. ECF No. 227 at 5-6.

The Government contends that length of the traffic stop was not unreasonably extended by officers, but rather resulted because "[t]he numerous warrants and convictions of the occupants in the vehicle spanned three states and required record checks and communications between those states to accurately determine their status." ECF No. 227 at 4.  Moreover, the Government argues Trooper Marra objectively and reasonably believed Defendant's possession of a firearm was a criminal offense. The Government argues, in conclusion, that "the stop was not impermissibly extended to utilize the K-9 as the officers already had reasonable suspicions and probable cause to arrest the occupants in the vehicle which was going to result in the vehicle being towed." ECF No. 227 at 7.

During oral arguments at the November 8, 2022 hearing, the Government further argued that the doctrine of inevitable discovery should apply to the evidence seized because Trooper Marra testified that all vehicle occupants were going to be arrested following the traffic stop, the vehicle going to be towed, and, pursuant to established West Virginia State Police policies, an inventory search of the vehicle was going to be conducted. [11:31:35-11:32:08]. The Government reiterated its argument that there was a litany of facts in this case which supported reasonable suspicion including, but not limited to, the vehicle's five-mile drive without indication of stopping, Trooper Marra's knowledge and experiences with the driver, Dennis Lytle, as an individual with a criminal history and substance abuse history, Dennis Lytle's contradictory

behavior, the odor of marijuana observed by Trooper Marra, and the presence of the firearm in the vehicle. [11:32:09-11:34:30].

## A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "cardinal principle" is "that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). It is generally the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. *See* Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

## B. Analysis

The issues presented require the following analysis: (1) whether there was reasonable suspicion to justify the investigative detention of Defendant Hamlet; (2) whether there was an impermissible delay in violation of Defendant Hamlet's Fourth Amendment rights; and (3) whether inevitable discovery doctrine applies under these circumstances.

**(1) Because there was reasonable suspicion of criminal activity, the investigative detention of Defendant Derrick Hamlet was permissible under the Fourth Amendment.**

An officer who imposes a detention for investigatory purposes "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3f 328, 335 (4th Cir. 2008), (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)), cert. denied, 555 U.S. 1118 (2009); Wren, 517 U.S. at 810; and United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2005). An officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation, but any further detention for questioning is beyond the scope of a Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc) (quoting United States v. Rusher, 966 F. 2d 868, 876-77 (4th Cir. 1992). Accord United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017)(checking identification of driver, vehicle registration, databases, calling for a K-9 Unit sniff for drugs and posing unrelated questions was permissible where it did not prolong stop for more than two minutes) and United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011)(asking drug-related questions during traffic stop permissible, but absent reasonable suspicion or diligence in pursuing purpose of stop fifteen-minute stop violated Fourth Amendment).

The Fourth Circuit has held that to prolong an investigative detention, an officer "must possess a justification for doing so other than the initial . . . violation that prompted the stop in the

first place." Branch, 537 F.3d at 336. This requires either the individual's consent or a "'reasonable suspicion' that illegal activity is afoot." Id.

In United States v. Branch, the Fourth Circuit has held that when "reasonable articulable suspicion of narcotics activity" develops during an otherwise lawful traffic stop, the officer's objectively reasonable suspicion of narcotics trafficking may justify a continued detention. United States v. Branch, 537 F.3d 328, 339 (4th Cir. 2008). Again, "in order to assess whether reasonable suspicion is present, we look at the 'totality of the circumstances' and the officer must demonstrate a 'particularized and objective basis for suspecting legal wrongdoing.'" United States v. Bernard, 927 F.3d 799, 805 (4th Cir. 2019) (citing United States v. Vaughan, 700 F.3d 705, 710 (4th Cir. 2012)). "Factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004) (citing United States v. Arvizu, 534 U.S. 266, 274–75 (2002). See also United States v. Bowman, No. CRIMA 3:07-00188, 2008 WL 153527, at *2 (S.D.W. Va. Jan. 14, 2008) ("The cumulative weight of this series of actions supports the officers' determination of reasonable suspicion that further investigation was warranted even though each act might be innocent in itself."). The reasonable duration of a stop cannot be determined with mathematical precision. Branch, 537 F.3d at 336.

Counsel for Defendant Derrick Hamlet argues there was no reasonable suspicion to justify the detention of Hamlet. Counsel for the Defendant argues that Hamlet was in lawful possession of the firearm, and thus, this should not be a factor for the purposes of reasonable suspicion, particularly in light of the recent decision in New York State Rifle & Pistol Assoc., Inc. v. Bruen, ___ U.S. ___, 142 S.Ct. 2111, ___ L.Ed.2d ___ (June 23, 2022). ECF No. 221 at 5-6 (citing Id. and W. Va. Const. Art. III, § 22). Defendant additionally argues that movement inside the vehicle and use of a cell phone light in a vehicle at night also do not support reasonable suspicion for

investigative detention and the later search. ECF No. 221 at 5. Counsel for the Government provides a responsive argument that the totality of the facts, including the delay in stopping the vehicle, the occupants' frantic, fidgeting behavior, and Trooper Marra's familiar with Lytle's criminal and substance abuse history, provided ample reasonable suspicion.

Here, before stopping the vehicle, Trooper Marra observed movement in the vehicle from the front passenger and the driver, which in addition to the vehicle's delay in pulling over, made Trooper Marra suspicious about possible concealment of contraband and narcotics activity. The "[e]vasive conduct, although stopping short of headlong flight, . . . informed" Trooper Marra's "appraisal of [the] encounter." United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993).

Shortly thereafter, Trooper Marra recognized the driver, Dennis Lytle, based upon his criminal history, prior substance abuse history, and status as a former Monongalia County, West Virginia probationer. This knowledge added to Trooper Marra's suspicions. *See* United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) ("A prior criminal record is not, standing alone, sufficient to create reasonable suspicion. Nevertheless, an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity.") (internal quotes and citations excluded).

Additionally, Trooper Marra soon observed a firearm in the front sweatshirt pocket or "hoodie" of Defendant Hamlet. It is well-established in the Fourth Circuit that firearms are "tools of the trade" in the illegal drug business, and it is of no legal consequence whether Derrick Hamlet's possession of the firearm was lawful or not.  United States v. Perry, 560 F.3d 246 (4th Cir.), *cert. denied*, 558 U.S. 866 (2009); United States v. Ward, 171 F. 3d 188, 195 (4th Cir.), *cert. denied*, 528 U.S. (1999); United States v. Kennedy, 32 F.3d 876, 882-83 (4th Cir. 1994); United States v. Hinds, 856 F.2d 438, 443 (4th Cir. 1988); United States v. Brockington, 849 F.2d 872,

876 (4th Cir. 1988). *See also* United States v. Robinson, 846 F.3d 694, 696 (4th Cir.) (*en banc*) (reasonable suspicion that an individual who had been lawfully stopped is armed is sufficient to justify frisk, that is, no further evidence of "dangerousness" is required), *cert. denied*, 13 S. Ct. 379 (2017). It is reasonable that the presence of a firearm in the vehicle, particularly one concealed in a passenger's hoodie, served as another basis for Trooper Marra suspecting that drug trafficking activity may be afoot.

Then, after assistance arrived and the occupants were directed to exit the vehicle, Trooper Marra observed a pink igloo lunchbox that Defendant Hamlet had been concealing under his legs, and Dennis Lytle coyly answered Trooper Marra's question about contraband by verbally answering "I don't think so" but also shaking his head "yes" to indicate there actually was contraband in the vehicle. Once alone, Dennis Lytle told Trooper Marra that he was working with the Mon. Metro Drug Task Force and that the occupants of the vehicles were driving home from a NA meeting. This added to Trooper Marra's suspicions about drug use, distribution, and criminal conduct. *See* United States v. Perkins, 363 F.3d 317, 322 (4th Cir. 2004) (officer's identification of individual as a known drug user who was involved in recent, relevant criminal conduct added to reasonable suspicion). Thereafter, Trooper Marra received information from dispatch that the driver and backseat passenger had outstanding warrants and that Derrick Hamlet had a criminal history and was cautioned that he was "disqualified" from possessing a firearm. Even if the information regarding Derrick Hamlet's status as a prohibited person was mistaken, the reliance on the information from dispatch was reasonable,[5] and this information reasonably added to

---

[5] *See generally* (regarding mistake of fact) United States v. Mubdi, 691 F.3d 334, 342 (4th Cir. 2012), *cert. granted, vacated on other grounds*, 570 U.S. 913, 133 S. Ct. 2851, 186 L. Ed. 2d 902 (2013) ("[i]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable. Great deference is given to the judgment of trained law enforcement officers[.]") (quoting United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003).

Trooper Marra's suspicions that criminal activity, particularly drug distribution or possession, was afoot. *See* Id.

Later, when advised that the troopers would be requesting a K-9-unit, Derrick Hamlet advised Trooper Marra that the dog would likely alert because he smoked marijuana earlier in the day. Trooper Marra also testified that she observed a slight odor of marijuana when near the vehicle. *See* United States v. White, 836 F.3d 437, 441 (4th Cir. 2016), *abrogated on other grounds by* United States v. Stitt, 202 L. Ed. 2d 364, 139 S. Ct. 399 (2018) ("This Court has repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.) (internal quotations omitted). Again, this admission and observation added to Trooper Marra's suspicions that not only was criminal activity afoot, but there may also be controlled substances or further contraband in the vehicle. *See* Perkins, 363 F.3d 317, 322 (4th Cir. 2004).

It is uncontested that Trooper Marra observed a legitimate traffic violation – a broken headlight on a vehicle driving at night – which justified the traffic stop. The totality of the circumstances, early into the traffic stop, created reasonable suspicion of criminal activity sufficient to hold Defendant Hamlet and the other vehicle occupants for a more prolonged period in order for Trooper Marra and other law enforcement to investigate the possible narcotics activity. The undersigned cannot say that that Trooper Marra's actions were unreasonable. Based on the evidence and testimony, it appears Trooper Marra was "dutifully investigating and uncovering criminality well within the bounds of Terry." McCoy, 513 F.3d at 415.  The undersigned **FINDS**, based on the evidence and testimony presented, that there was reasonable suspicion of criminal activity, particularly drug trafficking, to justify the investigative detention.

**(2) The extended delay was reasonable because the troopers were performing safety-related checks and diligently investigating their reasonable suspicions of criminal**

**activity. Moreover, troopers quickly had probable cause to arrest and take all occupants into custody.**

A drug dog's sniff of a vehicle does not require a warrant because it is not a "search" for purposes of the Fourth Amendment. Illinois v. Caballes, 543 U.S. 405, 409 (2005). The use of dog sniffs as an investigative tool is "*sui generis*" or unique under the Fourth Amendment. Id. at 408–09. When a trained narcotics dog "alerts" to the presence of drugs, this fact alone constitutes "probable cause" to search the vehicle to which the dog alerted. *See e.g.* Illinois v. Caballes, 543 U.S. 405, 409-410 (2005); United States v. Palmer, 820 F.3d 640, 650 (4th Cir. 2016); and United States v. Jeffus, 22 F.3d 554, 556-557 (4th Cir. 1994) (use of drug dog not itself a "search," but fact that drug dog "alerts" constitutes probable cause to search).

Law enforcement officers may detain a vehicle while awaiting a drug dog's arrival and sniff, but the detention must be reasonable, with officers using "diligence in pursuing their investigation" and minimizing intrusion upon the suspect. United States v. McBride, 676 F.3d 385, 395 (4th Cir. 2012) (fifty-five-minute detention of vehicle in parking lot while awaiting arrival of drug dog was not unreasonable as officers were diligent in their active investigation). *See also* United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) (eighty-minute wait for canine narcotics unit was reasonable); United States v. Yang, 345 F.3d 650, 653–54 (8th Cir.2003) (allowing for a more extended detention once defendant was allowed to drive to a more secure location). *But see* United States v. Place, 462 U.S. 696, 710, 103 S. Ct. 2637, 2646, 77 L. Ed. 2d 110 (1983) (ninety-minute detention of passenger and luggage unreasonable seizure).

Similarly, an officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants. United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (citing Rodriguez v. United States, —— U.S. ——, 135 S.Ct. 1609, 1615–16, 191

L.Ed.2d 492 (2015)). *See also* United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007) ("Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene. . . . The Supreme Court has long held that ensuring officers' personal safety is of critical importance in the conduct of traffic stops. It is well established that officers performing a lawful stop are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety' thereafter.") (quoting United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). Generally, however, an officer's focus must remain on the bases for the traffic stop, in that the stop must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." United States v. Guijon–Ortiz, 660 F.3d 757, 764 (4th Cir.2011) (internal quotation marks omitted).

Courts, in determining whether a prolonged detention is reasonable, are encouraged to "credit[] the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); *accord* Arvizu, 534 U.S. 266 at 273-74 (permitting "officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person[.]") (internal quotations omitted).

Here, the Government argues that any delay was reasonable as Trooper Marra was waiting on backup and waiting on confirmation from other states regarding the validity of Dennis Lytle and Daryl LaMaster's out-of-state arrest warrants. Counsel for the Government further argues "the traffic stop was not impermissibly extended to utilize the K-9 as the officers already had reasonable suspicions and probable cause to arrest the occupants in the vehicle which was going to result in the vehicle being towed." ECF No. 227 at 6-7.

The undersigned agrees with the position advanced by the Government. It is necessary that law enforcement officers be given some latitude under the Fourth Amendment to perform roadside investigations, and to check the veracity and validity of arrest warrants and criminal histories as reported by dispatch, particularly those involving out-of-state charges. *See* Palmer, 820 F.3d 640, 649 (4th Cir. 2016); United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007). The "ultimate touchstone of the Fourth Amendment is . . . 'reasonableness.'" Michigan v. Fisher, 558 U.S. 45, 47 (2009) (internal citations omitted).

It is undisputed that this traffic stop lasted beyond that of a standard traffic stop – approximately one hour and forty-two minutes. That being said, Trooper Marra would be remiss to let passenger Derrick Hamlet drive away with the subject vehicle, as suggested by defense counsel, while she and Trooper Little were still verifying the pending out-of-state warrants of the driver and backseat passenger of the vehicle and investigating the suspected drug trafficking activity in the vehicle. *See* United States v. McCoy, 513 F.3d 405, 415 (4th Cir. 2008) ("It would have been 'poor police work indeed,' for an officer of [her] experience to fail to investigate further given the numerous facts that strongly suggested, in light of his accrued knowledge of the drug trade, that a drug deal was afoot.").

Further, as suggested in the Government's brief and confirmed by Trooper Marra's testimony, the troopers believed, based on information relayed from West Virginia State Police dispatch, that Derrick Hamlet was a prohibited person in unlawful possession of a firearm and that there was probable cause for his immediate arrest. ECF No. 227 at 5-7.

Specifically, dispatch verbally advised that Derrick Hamlet was a prohibited person, based on the following, in addition to five other juvenile criminal charges, on Derrick Hamlet's "Triple III" report:

```
Caution Information
Firearms Disqualified Status    -
```

```
--------------------------------------------------------------------
Prosecutor Disposition   (Cycle 002)
Prosecution Date         2010-09-30
Prosecution Date         2010-09-30
Prosecutor Agency        MI630013A OAKLAND COUNTY PROSECUTING ATT
        Charge Literal   WEAPON-FREE SCHOOL ZONES - GENERAL FELONY
                         VIOLATIONS
              Statute    (750.237A1 )
               Counts    1
             Severity    Felony
        Charge Literal   CONTROLLED SUBSTANCE - POSSESSION OF MARIJUANA
                         OR SYNTHETIC EQUIVALENTS
              Statute    (333.74032D )
               Counts    1
             Severity    Misdemeanor
```

*See* ECF No. 253-2 at 6-7. Trooper Marra's testimony supports that, based upon this information, her intention was to arrest *all* vehicle occupants and have the vehicle impounded.

"For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002) (citing Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). "Not only does an officer not need proof beyond a reasonable doubt, there need not even be a preponderance of the evidence to support an officer's belief that probable cause exists." Denmark v. Starcher, No. 1:14CV58, 2016 WL 1122085, at *16 (N.D.W. Va. Mar. 22, 2016), aff'd, 683 F. App'x 195 (4th Cir. 2017) (citing United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004)); *see also* Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983) (Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); Maryland v. Pringle, 540 U.S. 366, 371, 124 S. Ct. 795, 800, 157 L. Ed. 2d 769 (2003) (probable cause requires a "reasonable ground for belief of guilt," and "the belief of guilt must be particularized with respect to the person to be searched or seized[.]").

Based upon Derrick Hamlet's possession of the firearm, as well as the information in his Triple III report and his admission that he smoked marijuana, there was enough evidence to warrant the belief of a reasonable officer that the offense of unlawful possession of a firearm by a prohibited person had been committed. Accordingly, any Fourth Amendment concerns about an intrusive delay were dispelled once there was an objective and reasonable basis for probable cause to arrest and transport Derrick Hamlet alongside the other two occupants who their own active, unrelated arrest warrants.

Even though Defendant Hamlet was delayed for approximately one hundred minutes, the undersigned **FINDS** that any delay here was reasonable under the Fourth Amendment because officers were diligently investigating the concerns of drug trafficking while minimizing intrusion upon the vehicle occupants, and because of the multi-faceted nature of this traffic stop, including waiting for roadside backup for officer safety, verifying multi-state warrants and criminal histories, and requesting K-9 assistance to investigate the suspect presence of controlled substances. Further, the undersigned **FINDS** that additional delay was also reasonable where objective probable cause existed to arrest and place Derrick Hamlet in custody alongside the other vehicle occupants.

**(3) Because the preponderance of the evidence supports that the evidence would have been lawfully discovered upon a routine inventory search of the vehicle, once impounded, the inevitable discovery doctrine also applies to items founds inside the vehicle.**

Defendant Hamlet, by counsel, argues that the inevitable discovery doctrine does not apply because there was not a West Virginia State Police inventory search policy in place to support that impound was inevitable and the evidence would have been lawfully discovered. Defendant relies, in part, on the recent decision of this Court in United States v. Williams, No. 5:22-CR-18, 2022 WL 5241754 (N.D.W. Va. Oct. 6, 2022). Defendant argues that here, like in Williams, there is no

written policy to support that an inventory search was inevitable and necessary, particularly where a passenger or driver could drive the vehicle away prior to said search.

The Government argues, in Response, that because the troopers had probable cause to arrest the vehicle occupants, it was inevitable that the vehicle was going to be towed, in accordance with the routine of the West Virginia State Police. ECF No. 227 at 6-7.

In Nix v. Williams, 467 U.S. 431, 444 (1984), the Supreme Court held that, pursuant to the "inevitable discovery" doctrine, improperly seized evidence may nevertheless be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." The inevitable discovery doctrine only applies where evidence *would* have been lawfully discovered; mere speculation that evidence *could* have been discovered in insufficient. United States v. Alston, 941 F.3d  132, 138-140 (4th Cir. 2019).

An inventory search is an "incidental administrative step following arrest and preceding incarceration conducted to protect the arrestee from theft of his possessions, the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." United States v. Banks, 482 F.3d 733, 739 (4th Cir. 2007) (internal quotations omitted) (citing Illinois v. Lafayette, 462 U.S. 640, 644-46 (1983). "An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017) (citing Colorado v. Bertine, 479 U.S. 367, 371–76, 107 S.Ct. 738 and United States v. Brown, 787 F.2d 929, 931–32 & n.3 (4th Cir. 1986)). Further, "the government need not provide a written inventory policy to

prove that a law enforcement agency conducts its inventory searches according to routine and standard procedures[.]" Bullette, 854 F.3d at 265 (4th Cir. 2017).

In United States v. Williams, local officers in Weirton, West Virginia encountered the defendant-driver's vehicle, which had slid off the road and into a light pole, in what appeared to be a single-car accident. Williams, No. 5:22-CR-18, 2022 WL 5241754, at *1 (N.D.W. Va. Oct. 6, 2022). Officers asked defendant for his license and proof of insurance, but the defendant was having a hard time retrieving his insurance information from his phone and officers believe defendant needed medical attention. Id. While the defendant-driver received medical attention in an ambulance on scene, officers entered his vehicle, without a warrant, looking for the insurance card, and during that search, found a loaded handgun with filed down serial numbers in the center console. Id. The Government argued this was a permissible inventory search because the vehicle was in lawful custody of police, the inventory search was routine and part of standard procedures, and the purpose was to secure the car and its contents. Id. This Court rejected that argument, holding that there was no reason for officers to conduct an inventory search, particularly where the Weirton Police Department's written Towing Policy provides that inventory searches are not required when an owner is present on scene during vehicle towing, and further holding that this inventory search "was not routine, it was not conducted according to standard procedures, and the purpose was to gather incriminating evidence." Williams, 2022 WL 5241754, at *3.

Here, Trooper Marra testified that there is not a West Virginia State Police policy dictating when a vehicle must be towed pursuant to a traffic stop or arrest. She explained that the choice, to tow or not to tow, is within a trooper's discretion. However, once the decision to tow a vehicle is made, there is a West Virginia State Police policy which requires that an inventory search be performed by a trooper prior to towing. The preponderance of the evidence supports that,

regardless of the later K-9 sniff and alert, troopers had probable cause to arrest all vehicle occupants and, consistent with routine practice, the vehicle would have been searched and towed.

Unlike <u>Williams</u>, where law enforcement performed an unreasonable, non-consensual search of a driver's vehicle in opposition to their agency's written policy, the facts here reflect that towing a vehicle upon the arrest of the occupants, while not required by a West Virginia State Police policy, is a routine and standard practice, and an inventory search would be required prior to the tow under the West Virginia State Police written policies. The discovery of the pink Igloo cooler and its contents was inevitable because the circumstances justified impoundment and an inventory search prior to towing is the standard procedure for West Virginia State Police. Accordingly, the undersigned **FINDS** that under the doctrine of inevitable discovery, the evidence seized may be admitted regardless of the Fourth Amendment violations alleged.

### IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress, [ECF No. 26], be **DENIED.**

Any party may, **within fourteen (14) days**, file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985);

Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted November 22, 2022.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE